# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

Thomas Jermaine Graves,     )     C/A No.: 1:19-1608-SVH

    )

         Plaintiff,     )

    )

     vs.     )

    )         ORDER

Andrew M. Saul,[1]     )

Commissioner of Social Security     )

Administration,     )

    )

         Defendant.     )

    )

This appeal from a denial of social security benefits is before the court for a final order pursuant to 28 U.S.C. § 636(c), Local Civ. Rule 73.01(B) (D.S.C.), and the order of the Honorable Richard M. Gergel, United States District Judge, dated June 5, 2019, referring this matter for disposition. [ECF No. 5]. The parties consented to the undersigned United States Magistrate Judge's disposition of this case, with any appeal directly to the Fourth Circuit Court of Appeals. [ECF No. 4].

Plaintiff files this appeal pursuant to 42 U.S.C. § 405(g) of the Social Security Act ("the Act") to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his claim for disability insurance benefits ("DIB"). The two issues before the court are

---

[1] Andrew M. Saul became the Commissioner of the Social Security Administration on June 17, 2019. Pursuant to Fed. R. Civ. P. 25(d), Saul is substituted for Nancy A. Berryhill.

whether the Commissioner's findings of fact are supported by substantial evidence and whether he applied the proper legal standards. For the reasons that follow, the court reverses and remands the Commissioner's decision for further proceedings as set forth herein.

## I.     Relevant Background

### A.     Procedural History

On August 22, 2017, Plaintiff filed an application for DIB in which he alleged his disability began on August 31, 2016. Tr. at 172–79. His application was denied initially and upon reconsideration. Tr. at 96–99, 103–06. On December 13, 2018, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Brian Garves. Tr. at 31–63 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 1, 2019, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 12–30. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–8. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on June 3, 2019. [ECF No. 1].

### B.     Plaintiff's Background and Medical History

#### 1.     Background

Plaintiff was 40 years old at the time of the hearing. Tr. at 59. He completed high school. *Id.* His past relevant work ("PRW") was as a police

officer, a sheriff's deputy, and an Army chemical operations specialist. Tr. at 58. He alleges he has been unable to work since August 31, 2016. Tr. at 172.

2.  Medical History

On February 9, 2015, Plaintiff presented to Nicole Edwards, M.D. ("Dr. Edwards"), for a compensation and pension ("C&P") exam of the knee and lower leg. Tr. at 1065. He reported swelling and popping, occasional use of a cane, limited ability to walk, and inability to bend, crouch, crawl, and run. Tr. at 1067–68, 1073. Dr. Edwards observed reduced range of motion ("ROM"), pain with weight bearing, tenderness to touch, swelling, and some joint instability in the left knee. Tr. at 1068, 1071. She noted x-rays dated December 22, 2014, suggested tricompartmental degenerative joint disease ("DJD"), most severe in the medial compartment. Tr. at 1074–75. Dr. Edwards diagnosed degenerative arthritis and stated Plaintiff's condition limited his functional abilities to perform occupational tasks and resulted in limited bending, walking, sitting, standing, crouching, climbing, and application of pressure to his knees. Tr. at 1067, 1075.

On February 25, 2015, Plaintiff reported minimal relief of left knee pain with over-the-counter medications. Tr. at 1063. Rochelle Hammett, M.D. ("Dr. Hammett"), observed Plaintiff to be moderately depressed and to have tenderness, eversion, and minimal fluid over the left knee. Tr. at 1063. She

referred Plaintiff for magnetic resonance imaging ("MRI") of his left knee and prescribed Tylenol with Codeine. Tr. at 1064.

Plaintiff presented to Michele Parnell, M.D. ("Dr. Parnell"), for a C&P exam for posttraumatic stress disorder ("PTSD") on February 27, 2015. Tr. at 1057. Dr. Parnell noted Plaintiff consumed alcohol on a near-daily basis. Tr. at 1060. Plaintiff endorsed the following symptoms: depressed mood; anxiety; chronic sleep impairment; mild memory loss, such as forgetting names, directions, or recent events; disturbances in motivation and mood; and difficulty in establishing and maintaining effective work and social relationships. Tr. at 1062. He reported being attacked while stationed in Iraq. Tr. at 1060. He indicated he had been exposed to actual or threatened death or serious injury through directly experiencing a traumatic event and witnessing the traumatic event as it affected others. Tr. at 1061. He endorsed intrusion symptoms that included recurrent, involuntary, and intrusive distressing memories of the traumatic event and recurrent distressing dreams in which the content and/or affect of the dream were related to the traumatic event. *Id.* He reported persistent avoidance of stimuli associated with the traumatic event, including avoidance of or efforts to avoid distressing memories, thoughts, or feelings about or closely associated with the traumatic event and avoidance of or efforts to avoid external reminders that aroused distressing memories, thoughts, or feelings about or closely

associated with the traumatic event. *Id.* He complained of negative alterations in cognitions and mood associated with the traumatic event, including persistent and exaggerated negative beliefs or expectations about himself, others, or the world; persistent, distorted cognition about the cause or consequences of the traumatic event that led him to blame himself or others; a persistent negative emotional state (e.g., fear, horror, anger, guilt, or shame); and feelings of detachment or estrangement from others. *Id.* He reported marked alterations in arousal and reactivity associated with the traumatic event, as evidenced by irritable behavior and angry outbursts (with little or no provocation), typically expressed as verbal or physical aggression toward people or objects; hypervigilance; exaggerated startle response; and sleep disturbance. Tr. at 1061–62. Dr. Parnell indicated Plaintiff's symptoms had lasted more than one month and caused clinically-significant distress or impairment in social, occupational, or other important areas of functioning. Tr. at 1062. She found the disturbance was not attributable to the physiological effects of a substance or another medical condition. *Id.* Dr. Parnell diagnosed PTSD and indicated it caused occupational and social impairment with occasional decrease in work efficiency and intermittent periods of inability to perform occupational tasks, but that Plaintiff was generally functioning satisfactorily, with normal, routine behavior and abilities to engage in self care and conversation. Tr. at 1058, 1063.

On March 9, 2015, an MRI of the left knee showed advanced degenerative arthritic changes, tear of the anterior cruciate ligament ("ACL"), degenerative erosion of the medial meniscus, degenerative changes to the lateral meniscus, and articular bony contusion of the medial tibia and femur with cortical cyst formation. Tr. at 1078.

Plaintiff presented to John R. Chu, M.D. ("Dr. Chu"), for an orthopedic surgery consultation on April 16, 2015. Tr. at 891. He endorsed left knee pain with a history of surgical intervention. *Id.* Dr. Chu observed tenderness to palpation and positive anterior Lachman test, but no effusion, erythema, or misalignment. Tr. at 892. He indicated an MRI showed a chronic ACL tear. *Id.* He referred Plaintiff to a sports medicine specialist for another surgical consultation, as he felt Plaintiff would require a complicated dual procedure. Tr. at 892, 893.

On April 27, 2015, Plaintiff presented to Diane Wininger, Psy. D. ("Dr. Wininger"), for a psychology consultation. Tr. at 895. He indicated he was seeking treatment based on difficulty sleeping, intrusive thoughts, nightmares, flashbacks, anxiety, irritability, and anger and endorsed symptoms of PTSD. *Id.* Dr. Wininger noted normal findings on mental status exam, except somewhat guarded behavior, failure to maintain eye contact, anxious mood and congruent affect, and fair insight and judgment. Tr. at 896. She provided a diagnostic impression of PTSD. *Id.*

Plaintiff complained of left knee pain, difficulty sleeping, forgetfulness at work, heart palpitations, and nightmares on April 30, 2015. Tr. at 1041–42. Naresh P. Emmanuel, M.D. ("Dr. Emmanuel"), noted Plaintiff appeared anxious. Tr. at 1048. He diagnosed PTSD, major depressive disorder ("MDD"), and insomnia. Tr. at 1049. He prescribed Prazosin 10 mg for PTSD, Trazodone 50 mg for sleep, and Cymbalta for depression and knee pain. Tr. at 1050.

On June 26, 2015, Plaintiff reported his forgetfulness had been noted at work and he feared his mental health problems were beginning to interfere with his job performance. Tr. at 1028 He complained of feeling irritable and hypervigilant and having decreased interest and poor concentration. Tr. at 1028–29. Dr. Emmanuel discontinued Trazodone, prescribed Ambien 5 mg for sleep, and increased Prazosin to 4 mg for nightmares, night sweats, and irritability. Tr. at 1032.

On July 31, 2015, Plaintiff continued to endorse anxiety and hypervigilance, but reported some improvement. Tr. at 1022. He endorsed sleeping six-to-seven hours per night, having nightmares and night sweats twice a week, being hypervigilant most of the time, feeling irritable and down, having decreased interest and poor concentration, and feeling stressed and on edge most of the time. Tr. at 1022–23. Dr. Emmanuel increased

Prazosin to 5 mg for nightmares, night sweats, and irritability and increased Ambien to 10 mg for sleep. Tr. at 1026.

On August 7, 2015, Plaintiff complained of knee pain and indicated he had recently choked a coworker during an argument. Tr. at 1017. Dr. Hammett noted Plaintiff appeared distraught and upset. *Id.* She indicated Plaintiff's left knee brace was interfering with his ROM and observed minimal medial and lateral tenderness. *Id.* Dr. Hammett contacted Brittany Rainwater, Psy. D. ("Dr. Rainwater"), who agreed to meet with Plaintiff that day to address his mental health concerns. *Id.*

Dr. Rainwater noted Plaintiff was very tearful and appeared highly distressed. Tr. at 1018. Plaintiff reported he carried his gun and always felt as if he were in danger because someone was out to get him. Tr. at 1019. He endorsed suicidal ideation, but denied having a plan. *Id.* He complained his medications made him feel drowsy and were not helping his symptoms. *Id.* Dr. Rainwater encouraged Plaintiff to discuss his medications with Dr. Emmanuel at his next medication monitoring visit and to begin therapy services. *Id.*

On September 2, 2015, Plaintiff reported no change following his last visit. Tr. at 1010. He complained of poor sleep, nightmares that occurred two-to-three times per week, hypervigilance, irritability, feeling down, decreased interest, poor concentration, and feeling stressed and on edge. Tr. at 1011.

8

Dr. Emmanuel increased Prazosin to 8 mg and continued Plaintiff's other medications. Tr. at 1014.

On October 2, 2015, Plaintiff reported poor sleep as a result of going to bed at 10:00 PM and waking at 3:00 AM. Tr. at 1000. He also endorsed nightmares occurring twice a week, frustrated mood, decreased interest, poor concentration, and feeling on edge most of the time. *Id.* Dr. Emmanuel instructed Plaintiff to take two Clonazepam and to increase Trazodone to 200 mg. *Id.* He indicated Plaintiff had anxious and variable/labile mood and constricted affect and failed to maintain eye contact. Tr. at 1001.

Plaintiff returned to Dr. Hammett for treatment of left knee pain on November 18, 2015. Tr. at 990. He indicated his pain medication "t[ook] the edge off," but denied using it often. Tr. at 991. Dr. Hammett observed left knee edema, tenderness on minimal palpation, and pain with flexion and extension. Tr. at 992. She advised Plaintiff to wear the knee brace and to elevate and ice his knee whenever possible. Tr. at 994.

On January 4, 2016, Plaintiff reported being irritable and short-tempered, sleeping poorly, experiencing daytime fatigue, having nightmares twice a week, feeling frustrated, and having decreased interest and poor concentration. Tr. at 981. Dr. Emmanuel noted Plaintiff's lack of eye contact, anxious and variable/labile mood, and constricted affect, but indicated no

other abnormalities on mental status exam. Tr. at 982–83. He continued Plaintiff on the same medications. Tr. at 985.

On January 10, 2016, Plaintiff presented to Carolinas Hospital System Marion after sustaining a fall. Tr. at 292. He complained of pain in his left knee and lumbar spine. *Id.* X-rays of the lumbar spine showed osteopenia with multilevel, multicolumn lumbar spondylosis. Tr. at 300. David Meacher, M.D. diagnosed cervical sprain, lumbar back pain, and left knee contusion. Tr. at 294.

On January 14, 2016, Plaintiff contacted the suicide prevention hotline for the Veterans Administration ("VA"). Tr. at 975. He endorsed depression, insomnia, nightmares, anger, difficulty being around and communicating with others, isolating in his room, and having suicidal and homicidal thoughts. Tr. at 976. Plaintiff agreed to follow up for additional supportive services through the VA. *Id.*

Plaintiff underwent MRI of the lumbar spine, the left knee, and the thoracic spine on January 26, 2016. Tr. at 776–79. The lumbar MRI showed moderate-to-severe right and moderate left L5–S1 foraminal stenosis and mild-to-moderate facet hypertrophy with mild thecal sac stenosis and mild bilateral foraminal stenosis at L4–5. Tr. at 779. An MRI of the left knee showed degenerative tear and maceration throughout the entire medial meniscus; tricompartmental osteoarthritis with small joint effusion and

complete cartilage loss throughout the majority of the medial compartment with underlying bony changes and other cartilage thinning of the patellofemoral compartment; likely disruption of the ACL; and ganglion cyst formation along the origin of the gastrocnemius. Tr. at 777. An MRI of the thoracic spine revealed mild endplate spurring at T2–3 and T3–4 with minimal flattening of the ventral thecal sac. Tr. at 776.

On February 16, 2016, T. Scott Ellison, M.D. ("Dr. Ellison"), noted Plaintiff has been injured on the job when he fell down stairs while attempting to clear a crime scene. Tr. at 340. Plaintiff endorsed neck pain and lumbar pain that occasionally radiated into his legs and feet. Tr. at 340. Dr. Ellison observed mild bilateral tenderness to palpation of the cervical spine, mild diffuse tenderness in the mid-lumbar spine and at the thoracolumbar junction, and limited ROM of the thoracolumbar spine secondary to pain, but noted no other abnormalities on physical exam. Tr. at 340–41. He assessed low back pain, thoracic spine pain, cervicalgia, lumbosacral intervertebral disc degeneration of the lumbosacral region, and lumbar radiculopathy. Tr. at 342. Dr. Ellison saw no indication for surgery and recommended Plaintiff take Mobic, participate in physical therapy, work on light duty, and follow up in six weeks. *Id.*

On February 22, 2016, Plaintiff presented to Patrick Denton, M.D. ("Dr. Denton"), for examination of his left knee. Tr. at 762. He reported a history of

left knee arthroscopic surgery in 2007. *Id.* He complained of increased pain, swelling, and buckling of the left knee following the fall on January 10. *Id.* Dr. Denton observed antalgic gait, varus deformity, mild tenderness along the medial joint line, crepitus with ROM, and 2+ instability on Lachman test. Tr. at 763. He assessed unilateral primary arthritis of the left knee and chronic ACL tear. *Id.* He administered a steroid injection to Plaintiff's left knee and prescribed Voltaren. Tr. at 763–64.

Plaintiff complained of anxiety, palpitations, poor sleep, nightmares twice a week, night sweats, irritability, decreased interest, poor concentration, and stress on April 4, 2016. Tr. at 952–53. Dr. Emmanuel described Plaintiff's mood as anxious and variable/labile and his affect as mildly constricted. Tr. at 953. He indicated Plaintiff made no eye contact. *Id.* However, he noted otherwise normal findings on mental status exam. Tr. at 953–54. He increased Buspirone to 10 mg twice a day. Tr. at 957.

On April 5, 2016, Plaintiff complained of mid-lumbar pain to the thoracolumbar junction and some pain at the base of his neck. Tr. at 338. He reported numbness and tingling in the mid-lumbar back and rare shooting pain through his legs and feet. *Id.* Dr. Ellison observed that Plaintiff appeared sleepy and made minimal eye contact. *Id.* He prescribed Mobic and referred Plaintiff to physical therapy. Tr. at 339. He indicated Plaintiff was limited to work at light duty. *Id.*

On April 25, 2016, Plaintiff reported good relief from the prior injection, but complained his knee remained quite sore. Tr. at 760. Dr. Denton observed varus alignment, medial joint tenderness, positive Lachman test, and stable collateral exam of the left knee. *Id.* He recommended repeat steroid injection, physical therapy, and Synvisc injection. Tr. at 761.

On May 5, 2016, Plaintiff complained of pain mostly at the lumbosacral junction with numbness and tingling at the thoracolumbar junction. Tr. at 336. He indicated his pain was exacerbated by sitting, and he was no longer able to lift weights. *Id.* He reported no relief through physical therapy or use of Mobic. *Id.* Dr. Ellison noted flat affect and mild reproducible tenderness in the mid-thoracolumbar back and lumbosacral junction. *Id.* He recommended Plaintiff obtain a pain management consultation. *Id.* He restricted Plaintiff to light duty work. Tr. at 337.

Plaintiff followed up with Dr. Hammett for pain in his back and left knee on May 26, 2016. Tr. at 935. Dr. Hammett indicated no abnormal findings on physical exam. Tr. at 936–37.

On May 27, 2016, Dr. Denton administered a Synvisc injection to Plaintiff's left knee. Tr. at 759.

On June 7, 2016, Plaintiff reported back, hip, and knee pain and complained he was not able to exercise and was gaining weight. Tr. at 928. He indicated the pain was interfering with his sleep, causing him to feel

stressed during the day. *Id.* He also endorsed irritability, frustration, decreased interest, poor concentration, feeling on edge, nightmares, and possible flashbacks during the night. *Id.* Dr. Emmanuel indicated Plaintiff had anxious and variable/labile mood, mildly constricted affect, and failed to make eye contact. Tr. at 929. He increased Prazosin to 10 mg and Duloxetine to 120 mg and noted the medications could cause drowsiness. Tr. at 932.

On June 21, 2016, Plaintiff reported mid-lumbar and lumbosacral pain with shooting pain down the legs and into the feet. Tr. at 334. Dr. Ellison discussed multiple treatment options with Plaintiff, including pain management, anterior lumbar interbody fusion, and discogram. *Id.* He cautioned against discogram and encouraged Plaintiff to pursue pain management treatment. *Id.* He instructed Plaintiff to continue to work on light duty, if available. Tr. at 335.

Plaintiff presented to Barbara Sarb, D.O. ("Dr. Sarb"), for an initial pain management consultation on July 13, 2016. Tr. at 765. He complained of pain that radiated from his low back to his buttocks and down his legs. *Id.* He claimed the pain was exacerbated by walking. *Id.* He also endorsed occasional tingling in his hands and across his shoulder blades. *Id.* Dr. Sarb noted good ROM of the cervical spine, negative Spurling's test, positive Tinel's sign at the wrist, increased muscle tension in the thoracolumbar region, and tenderness at the lumbosacral junction. Tr. at 766. She indicated no

abnormalities on neurological and musculoskeletal exams. *Id.* She diagnosed chronic lumbar radiculopathy, lumbar disc disease with radiculopathy, thoracic back pain, myofascial pain syndrome, and paresthesia/numbness. Tr. at 766–67. She recommended epidural steroid injections ("ESI") and physical therapy and prescribed Zanaflex. Tr. at 767. Dr. Sarb administered a lumbar ESI on July 26, 2016. Tr. at 350.

On August 12, 2016, Plaintiff reported pain interfering with sleep, weight gain caused by inability to exercise, increased stress, nightmares, possible flashbacks, increased irritability, decreased interest, and poor concentration. Tr. at 689. Dr. Emmanuel indicated normal findings on mental status exam, aside from anxious and variable/labile mood and mildly constricted affect. Tr. at 690. He made no changes to Plaintiff's medication regimen. Tr. at 692.

On August 22, 2016, Plaintiff complained of low back pain that radiated into his buttocks, down his leg, and into his ankles. Tr. at 320. He reported 30% improvement for one week following lumbar ESI. *Id.* He claimed his low back pain was exacerbated by sitting for prolonged periods and use of his left knee brace. *Id.* Dr. Sarb noted Plaintiff walked with a limp, but indicated no additional abnormalities on exam. Tr. at 321. She administered another lumbar ESI. Tr. at 322.

Plaintiff again contacted the VA suicide prevention hotline to report suicidal thoughts on September 6, 2016. Tr. at 915. He also complained of anger problems, employment-related issues, sleep disturbance, and symptoms of PTSD. Tr. at 916. He indicated he had held onto a gun the prior week and had slept for four hours over the prior four days. *Id.* He endorsed nightmares, fits of rage occurring every other day, and panic attacks. *Id.* He declined dispatch of emergency personnel and agreed to ask his mother to drive him to the Dorn VA Medical Center ("Dorn") for treatment. *Id.*

On September 7, 2016, Plaintiff attended a counseling session. Tr. at 913. He reported he felt angry at work and feared he would lash out at coworkers he feared were trying to have him terminated. Tr. at 914. He admitted suicidal ideation and indicated he desired to drink alcohol to fall asleep. *Id.*

During a psychotherapy session on September 13, 2016, Plaintiff reported a significant increase in PTSD symptoms over the prior week that had resulted in increased emotional distress. Tr. at 685. He informed Dr. Wininger that he had previously managed his PTSD symptoms through exercise, but had been unable to do so following his injury. *Id.* He endorsed increased nightmares, hypervigilance, and anger. *Id.* Dr. Wininger described Plaintiff's mood and affect as anxious and dysphoric and his insight as fair. Tr. at 686.

Plaintiff reported exacerbation of PTSD symptoms secondary to psychosocial stressors on September 20, 2016. Tr. at 683. Dr. Wininger described anxious and dysphoric mood, affect congruent with mood, and fair insight. Tr. at 684.

On September 22, 2016, Dr. Sarb explained electrodiagnostic evaluation of Plaintiff's lower extremities was within normal limits. Tr. at 318. Plaintiff described pain from his waistline to the lumbosacral junction that worsened with extension and twisting. *Id.* Dr. Sarb noted no abnormalities on physical exam. *Id.* She recommended Plaintiff proceed with diagnostic medial branch blocks. *Id.* Technician Leavy Wells administered nerve conduction velocity ("NCV") and electromyography ("EMG") tests to Plaintiff's lower extremities. Tr. at 324–27. Dr. Sarb reviewed test results and found normal EMG/NCV of the lower extremities and no evidence of active radiculopathy, mono-neuropathy, or peripheral neuropathy. Tr. at 323.

On September 26, 2016, Plaintiff complained his left knee pain was worsening, despite use of a brace, injections, and medications. Tr. at 305. Dr. Denton observed varus alignment, medial joint tenderness, and mild patellofemoral crepitus in the left knee. *Id.* He assessed unilateral primary osteoarthritis. *Id.*

On September 27, 2016, Plaintiff reported the pain in his left knee was more severe than the pain in his back. Tr. at 331. Dr. Ellison recommended

Plaintiff continue to follow up with Dr. Sarb for pain management. Tr. at 332. Plaintiff continued to endorse PTSD symptoms, but reported a slight decrease in anxiety and irritability despite continued psychosocial stressors. Tr. at 681. Dr. Wininger noted fair insight and anxious mood with congruent affect, but otherwise normal findings on mental status exam. Tr. at 682.

Dr Sarb administered bilateral diagnostic medial branch blocks at L3, L4, and L5 on October 3 and 17, 2016. Tr. at 312–17.

On October 13, 2016, Plaintiff reported increased anxiety, hypervigilance, sleep disturbance, irritability, and difficulty concentrating. Tr. at 679. Dr. Wininger observed Plaintiff to be distracted at times, to have anxious mood and congruent affect, and to show fair insight. Tr. at 680.

On November 10, 2016, Plaintiff presented to John Wyland, M.D. ("Dr. Wyland"), for a second opinion as to his left knee pain. Tr. at 485. Dr. Wyland indicated the following on orthopedic exam: genu varum alignment greater on the left than the right; mild effusion to the left knee; positive Lachman test; positive pivot shift; pseudolaxity to valgus stress and grade I laxity to varus stress; normal posterior drawer; tenderness over the medial joint line with positive meniscal signs; good ROM; no warmth or erythema; some quadriceps atrophy; ability to perform a quad set and straight leg raise; and neurologically- and vascularly-intact leg. Tr. at 487. He assessed ACL rupture and recurrent tearing of the meniscus. *Id.* He declined to recommend

total knee replacement given Plaintiff's age and desire to engage in high-level activities and instead recommended a valgus-producing high tibial osteotomy in combination with ACL reconstruction. Tr. at 488.

On November 14, 2016, Plaintiff reported ESIs had been ineffective. Tr. at 309. He complained of midline tenderness at the lumbosacral junction, the waistline, and along the paraspinal muscles to the left at L3–4, L4–5, and L5–1. Tr. at 310. Dr. Sarb observed Plaintiff to demonstrate good ROM; to be awake, alert, and conversant with fluent speech, normal mood, and full affect; to have normal bulk and tone and 5/5 strength in the upper and lower extremities; to have intact sensation; to show no ataxia of gait; and to have normal deep tendon reflexes. Tr. at 310–11. She assessed myofascial pain syndrome and DJD of the lumbar spine and administered trigger point injections. Tr. at 311.

On November 15, 2016, Dr. Wininger observed Plaintiff to be distracted at times, to have anxious mood and congruent affect, and to have fair insight. Tr. at 671. Plaintiff followed up with Dr. Emmanuel and reported poor sleep, weekly nightmares, night sweats, irritability, frustration, decreased interest, poor concentration, and feeling on edge most of the time. Tr. at 673. Dr. Emmanuel made no changes to Plaintiff's medications. Tr. at 677.

On November 18, 2016, an MRI of Plaintiff's left knee showed no acute meniscal or ligamentous injury, absence of the majority of the medial

meniscus likely related to prior meniscal debridement, absence of the ACL consistent with old/remote disruption, and moderate-to-severe DJD. Tr. at 775.

Plaintiff complained of slightly worsened lumbar pain on November 18, 2016. Tr. at 329. Dr. Ellison indicated he was not convinced Plaintiff's degenerative disc disease at L4–5 was causing his pain, but it was possible. *Id.* He stated he hoped Plaintiff's back pain would decrease as a result of improved gait following knee surgery. *Id.* He indicated Plaintiff retained a light duty work status. Tr. at 330.

On January 10, 2017, Plaintiff reported increased irritability, anger, nightmares, sleep disturbance, intrusive thoughts, and hypervigilance. Tr. at 668. He indicated his family members had commented on his increased symptoms, but he did not feel comfortable discussing his problems with them. *Id.* He reported he had recently experienced an extremely upsetting nightmare. *Id.* He endorsed limited success in using coping mechanisms. *Id.* Dr. Wininger described Plaintiff as distracted at times, having an anxious and frustrated mood and congruent affect, and demonstrating fair insight. Tr. at 669.

On January 30, 2017, Plaintiff reported improved mood and doing better overall. Tr. at 666. He indicated he was nervous about upcoming knee surgery, but looking forward to recovery. *Id.* He continued to endorse

symptoms of PTSD, but indicated he was implementing coping mechanisms with moderate success. *Id.*

On February 2, 2017, Dr. Wyland performed left knee arthroscopy and open ACL reconstruction, partial medial meniscectomy, parapatellar release and debridement chondroplasty, operation chondroplasty medial femoral condyle and medial tibial plateau, and high tibial osteotomy. Tr. at 785. A postsurgical x-ray of Plaintiff's left knee showed well-positioned hardware, as well as osteoarthritis with advanced medial compartment joint space narrowing and osteophyte formation. Tr. at 478.

Plaintiff followed up with Dr. Wyland on February 16, 2017. Tr. at 502. He indicated he had discontinued use of the continuous passive motion ("CPM") device after he noticed a painful pop that seemed to be behind his patella. *Id.* Dr. Wyland noted decreased patellar mobility, but indicated the wound was healing nicely with minimal swelling and effusion. Tr. at 505. He aspirated bloody effusion from the left knee and administered a cortisone injection. *Id.* He advised Plaintiff to continue use of the CPM device to and expect awkwardness at the beginning stages, as he attempted to regain ROM. *Id.*

On February 17, 2017, Plaintiff complained his left knee pain and nightmares were interrupting his sleep. Tr. at 660. He reported intermittent night sweats, irritability, variable mood, feeling down and frustrated,

decreased interest, poor concentration, and feeling on edge. *Id.* Dr. Emmanuel described Plaintiff's mood as anxious and variable/labile and his affect as mildly constricted. Tr. at 661. He indicated Plaintiff made no eye contact. *Id.* However, he noted otherwise normal findings on mental status exam. Tr. at 660–62. He made no changes to Plaintiff's medications. Tr. at 663.

Plaintiff presented to the Dorn emergency room ("ER") on February 27, 2017, for ringing in the bilateral ears, increased irritability, moodiness, nightmares, palpitations, increased anxiety, and feeling as if he were on constant alert. Tr. at 655–56. Nurse Practitioner Kristy Speronis ("NP Speronis"), noted no abnormalities on mental exam and assessed tinnitus and PTSD. Tr. at 657–58.

Plaintiff reported improvement to his left knee on March 22, 2017. Tr. at 520. Dr. Wyland noted Plaintiff's left leg valgus alignment was as expected, his wound was nicely healed, his ROM was somewhat limited, he had good quadriceps control and tone, his knee was stable, and he had only mild swelling. Tr. at 523. He instructed Plaintiff to progress to weight bearing as tolerated over the next two-to-three weeks. Tr. at 523.

On April 18, 2017, Plaintiff complained of sleep disturbance secondary to pain and nightmares, irritability, night sweats occurring three times per week, daytime fatigue, variable mood, decreased interest, poor concentration,

and anxiety. Tr. at 398. Dr. Emmanuel observed Plaintiff to ambulate with abnormal gait; to demonstrate anxious and variable/labile mood and mildly constricted mood; and to avoid eye contact. Tr. at 399. Plaintiff endorsed suicidal ideation, but denied having a plan. *Id.* Dr. Emmanuel instructed Plaintiff to continue to take his medications and to start Melatonin 6 mg for sleep. Tr. at 401.

On April 19, 2017, Plaintiff reported sleeping three-to-four hours per night and experiencing nightmares several times per week. Tr. at 396.

On May 8, 2017, Dr. Wyland observed left knee effusion. Tr. at 542. He aspirated fluid from the left knee, administered a cortisone injection, and prescribed a right heel lift to address leg-length discrepancy. Tr. at 543.

On June 12, 2017, Dr. Wininger observed Plaintiff to walk very slowly with a cane and to appear to be experiencing significant pain in his left knee and back. Tr. at 395. Plaintiff reported increased anxiety, hypervigilance, anger, sleep disturbance, and isolative and avoidance behaviors. *Id.* He indicated he felt overwhelmed by current life stressors. *Id.* Dr. Wininger observed Plaintiff to be distracted at times and to demonstrate anxious and frustrated mood and affect. *Id.*

During a medication management visit on June 23, 2017, Plaintiff complained of sleeping three-to-four hours per night, daytime fatigue, two-to-three nightmares per week, night sweats occurring three times per week,

irritability, variable mood, decreased interest, poor concentration, and anxiety. Tr. at 383. Dr. Emmanuel observed Plaintiff to ambulate with abnormal gait and an assistive device. Tr. at 384. He observed anxious and variable/labile mood, constricted affect, and failure to maintain eye contact, but noted otherwise normal findings on mental status exam. Tr. at 384–85. He assessed PTSD, MDD, generalized anxiety disorder ("GAD"), and insomnia secondary to PTSD. Tr. at 386. He noted Plaintiff was taking medication when he remembered to do so, and recommended he use a weekly pill container as a reminder to take his medication as prescribed. Tr. at 387. He discontinued Mirtazepine and Melatonin, prescribed Trazodone, and renewed prescriptions for Prazosin, Duloxetine, and Buspirone. *Id.*

On July 10, 2017, Plaintiff returned to Dr. Wyland for a recheck of his left knee. Tr. at 449. He reported doing better with slightly improved gait. Dr. Wyland observed good ROM, normal stability, good patella movement, slight swelling, and slight effusion of Plaintiff's left knee. Tr. at 451–52. He administered a Synvisc injection to Plaintiff's left knee, continued his medications, modified his physical therapy, instructed him to continue to use a transcutaneous electrical nerve stimulation ("TENS") unit, and continued his handicapped placard. Tr. at 450–51, 452–53, 454. He recommended Plaintiff return to work "at least at a desk position," but indicated he was

"not ready for return to the regular police officer duties, which would include running, jumping, and landing." Tr. at 452.

Plaintiff contacted the VA crisis hotline for suicidal and homicidal thoughts on July 12, 2017. Tr. at 377–79. He presented to Dorn for a crisis visit on July 24, 2017. Tr. at 375. He stated he felt stressed and overwhelmed and had increased symptoms of PTSD and depression. Tr. at 376. He endorsed sleep disturbance, nightmares, intrusive thoughts, flashbacks, anxiety, irritability, anger, hypervigilance, persistent negative beliefs, distress associated with cues, isolative and avoidance behaviors, depressed mood, loss of interest and motivation, fatigue, decreased attention and concentration, and pain in his left knee and lower back. *Id.* Dr. Wininger observed Plaintiff's mood to be anxious and dysphoric and his affect to be congruent with his mood, but indicated no other abnormal findings on mental status exam. Tr. at 376–77.

On July 27, 2017, Plaintiff complained of thoracic, mid-lumbar, and lumbosacral pain with occasional shooting pain radiating to his thighs upon standing. Tr. at 359. Dr. Ellison authorized him to remain out of work for three additional months. *Id.* He recommended Plaintiff continue to convalesce from his left knee surgery and obtain a new MRI of the lumbar spine prior to a three-month follow up visit. Tr. at 359–60. He indicated he considered Plaintiff's PTSD to be a confounding factor in his convalescence. Tr. at 360.

On August 1, 2017, social worker Joanna Plunkett ("SW Plunkett"), observed Plaintiff to ambulate with a cane. Tr. at 373. She indicated Plaintiff's grooming was fair; his speech was normal; his eye contact was fair; his mood was dysphoric, but cooperative; his affect was congruent to his mood; his thought process was logical, linear, and goal-directed; and his thought content was appropriate. Tr. at 373–74. Plaintiff endorsed fleeting suicidal ideation and indicated he was isolating from his family in his bedroom much of the time. Tr. at 374. He reported repeated, disturbing, and unwanted memories of a 2004 attack on his squad in Iraq; repeated, disturbing dreams of this experience; flashbacks, feeling upset when reminded of the experience; strong physical reactions to reminders of the experience; avoidance of memories, thoughts, or feelings related to the experience; avoidance of external reminders of the experience; having strong negative beliefs about himself, other people, or the world; blaming himself or someone else for the experience or its aftermath; having strong negative feelings such as fear, anger, guilt, or shame; loss of interest in activities that he used to enjoy; feeling distant or cut off from other people; trouble experiencing positive feelings; irritable behavior, angry outbursts, or acting aggressively; being super alert or watchful or on guard; feeling jumpy or easily startled; having difficulty concentrating; and having trouble falling or staying asleep. Tr. at 409–10. He endorsed symptoms of depression that

included anhedonia, trouble falling or staying asleep, feeling tired or having little energy, poor appetite or overeating, feeling bad about himself or that he was a failure or had let his family down, trouble concentrating, suicidal thoughts, and feeling down, depressed, or hopeless. Tr. at 410–11. SW Plunkett encouraged Plaintiff to contact the Trauma Recovery Program Coordinator to schedule an initial evaluation appointment if he was interested in moving forward with the supported PTSD treatment. Tr. at 375. Plaintiff indicated he would consider and discuss it with his regular psychologist prior to moving forward. *Id.*

On September 11, 2017, Plaintiff reported his left knee was a little better, but his back was causing more difficulties. Tr. at 466. Dr. Wyland observed no significant effusion, good patellar mobility, normal stability, normal endpoint with Lachman test, good quadriceps control and tone, and a little weakness on squat test. Tr. at 469. He stated Plaintiff's knee was doing very well, with excellent alignment and stability and minimal swelling. *Id.* He noted Plaintiff's back pain was preventing him from performing the full rehabilitation workout required for return to his job as a police officer. *Id.* He stated Plaintiff could return to work in a sedentary position. *Id.*

On September 25, 2017, Plaintiff complained of chronic pain in his back and left knee that interfered with sleep. Tr. at 616. He indicated he felt tired and irritable during the day, experienced nightmares two-to-three times per

week, had intermittent suicidal thoughts that worsened with increased pain, felt frustrated, had decreased interest and poor concentration, and felt stressed. Tr. at 616–17. Dr. Emmanuel noted anxious and variable/labile mood, mildly constricted affect, and absent eye contact, but indicated no other abnormalities on mental status exam. Tr. at 618–19. He continued Plaintiff's medications without change. Tr. at 621.

On October 6, 2017, an MRI of Plaintiff's lumbar spine showed hypoplastic disc at S1–S2; mild bulging annulus narrowing the foramina and mild bilateral facet hypertrophy at L4–5; a moderate central right disc extrusion compressing the right S1 nerve root in the right lateral recess; and moderate bilateral foraminal disc protrusions and bilateral lateral recess stenosis at L5–S1. Tr. at 740.

Plaintiff presented to the Dorn ER on October 11, 2017, for worsening left knee pain. Tr. at 612–13. He also endorsed suicidal ideation. Tr. at 613.

On October 12, 2017, state agency consultant Jeanne Wright, Ph.D. ("Dr. Wright"), reviewed the evidence and completed a psychiatric review technique, considering Listings 12.04 for depressive, bipolar, and related disorders, 12.06 for anxiety and obsessive-compulsive disorders, and 12.15 for trauma and stressor-related disorders. Tr. at 67–68. Dr. Wright assessed a moderate degree of limitation as to Plaintiff's abilities to understand, remember, or apply information; interact with others; concentrate, persist, or

maintain pace; and adapt or manage himself. *Id.* She completed a mental residual functional capacity ("RFC") assessment, finding Plaintiff was moderately limited as to the following abilities: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or proximity to others without being distracted by them; to interact appropriately with the general public; and to accept instructions and respond appropriately to criticism from supervisors. Tr. at 71–73.

On October 20, 2017, state agency medical consultant Ellen Humphries, M.D. ("Dr. Humphries"), reviewed the record and completed a physical RFC assessment, finding Plaintiff to be limited as follows: occasionally lifting and/or carrying 20 pounds; frequently lifting and/or carrying 10 pounds; standing and/or walking for a total of two hours; sitting for a total of about six hours in an eight-hour workday; frequently balancing; and occasionally stooping, kneeling, crouching, crawling, and climbing stairs, ramps, ladders, ropes, and scaffolds. Tr. at 69–71.

On October 25, 2017, Plaintiff presented to the Dorn ER for pain in his lower back and left knee. Tr. at 607. Nurse Practitioner Lauren Golden ("NP Golden"), observed right lumbar paraspinal muscle tenderness to palpation and tightness. Tr. at 609. She noted no instability or other abnormality to Plaintiff's left knee. *Id.* X-rays of Plaintiff's left knee showed postsurgical

changes, including hardware in the proximal tibia and a surgical clip along the cortical margin of the lateral femoral condyle. Tr. at 577. They also indicated degenerative changes of the medial compartment and the edges of the patellar articular surface. *Id.* X-rays of Plaintiff's lumbar spine showed what appeared to be a transitional vertebra at S1, as well as degenerative changes to the facets at the lower lumbar levels and loss of disc height at L5–S1. Tr. at 578. NP Golden assessed lumbago with sciatica and acute-on-chronic left knee pain. Tr. at 610. She administered a Toradol injection, prescribed a Medrol Dosepak, and requested a knee brace with joints. Tr. at 592–93, 610.

On October 26, 2017, Dr. Ellison recommended Plaintiff proceed with lumbar microdiscectomy at L5–S1. Tr. at 697. He authorized Plaintiff to remain out of work until after the surgery. *Id.*

On November 13, 2017, Plaintiff rated his left knee pain as a seven of 10. Tr. at 713. Dr. Wyland indicated Plaintiff's knee rehabilitation was on hold until after he underwent microdiscectomy. *Id.* He observed mild swelling, normal stability, good ROM, good muscular control, good strength, and no warmth or erythema on orthopedic exam of the left knee. Tr. at 716. He advised Plaintiff to continue rehabilitation once Dr. Ellison cleared him to do so and to follow up in two months. Tr. at 717.

On November 27, 2017, Dr. Ellison performed right L5–S1 microsurgical decompression and discectomy with foraminotomy. Tr. at 727, 730–32.

On December 8, 2017, Plaintiff complained of severe pain, and Dr. Wininger observed him to be walking slowly with a cane. Tr. at 745. He continued to complain of symptoms of PTSD and depression that were exacerbated by psychosocial stressors. *Id.* Dr. Wininger noted Plaintiff "appeared to be in significant pain," was distracted at times, had anxious and dysphoric mood and affect, and had fair insight and judgment. Tr. at 745–46.

Plaintiff followed up with Dr. Ellison for a wound check and staple removal on December 11, 2017. Tr. at 748. Dr. Ellison observed Plaintiff to ambulate to the exam room unassisted. *Id.* He noted minimal redness, but no edema or drainage. *Id.*

On January 9, 2018, Plaintiff endorsed symptoms of depression and PTSD and indicated he continued to experience a lot of pain. Tr. at 872. Dr. Wininger observed Plaintiff to be walking very slowly with a cane and to appear to be in pain. *Id.* Plaintiff reported a recent accident that resulted in his car being totaled, but denied injury. *Id.* Dr. Wininger noted Plaintiff was distracted at times, had anxious and dysphoric mood and affect, and showed fair judgment and insight. Tr. at 873.

On January 16, 2018, Plaintiff reported depression, difficulty staying asleep during the night and sleeping during the day. Tr. at 868. He indicated he believed he had sleep apnea. Tr. at 868. Dr. Hammett noted Plaintiff had a flat affect and was ambulating with a cane. Tr. at 869. She observed tenderness, warmth, and positive bulge sign in Plaintiff's left knee, but no crepitus. *Id.* She stated Plaintiff had difficulty elevating the left knee and experienced pain with flexion and extension of the knee joint. *Id.*

Plaintiff participated in a PTSD clinical trauma history and assessment on January 19, 2018. Tr. at 864–68. He recounted an incident in Iraq in which his friend was injured by incoming fire while beside him. Tr. at 865. Psychologist Kristina Seymour observed Plaintiff to be tearful in recounting the memory. *Id.* She observed the following on mental status exam: casually groomed; good eye contact; oriented to person, place, time, and situation; normal speech; anxious mood and congruent affect; logical and goal-directed thought processes; no evidence of formal thought disorder or psychosis; good insight and judgment; and no suicidal or homicidal ideation, intent, or plan. Tr. at 864–65. She indicated Plaintiff met various diagnostic criteria for PTSD. Tr. at 865–67.

On January 23, 2018, Plaintiff reported severe, burning lumbar pain that had not been relieved by the surgery. Tr. at 794. He indicated 70% improvement in his right leg pain, but complained of a recent increase in pain

after being required to bend forward during physical therapy. *Id.* He stated his PTSD symptoms had recently caused him to have a car accident. *Id.* Dr. Ellison informed Plaintiff that lumbar fusion was an option, but that he did not consider it the best option given his overlay of PTSD and significant pain. Tr. at 795.

Plaintiff presented to the Dorn ER on January 31, 2018, for left knee pain and swelling. Tr. at 861–62. Ralf Joffe, M.D. ("Dr. Joffe"), noted mild edema in Plaintiff's left knee, but indicated no additional abnormalities. Tr. at 863. X-rays of Plaintiff's left knee showed severe medial and mild lateral compartment DJD, as well as mild-to-moderate patellofemoral DJD. Tr. at 833.

On February 5, 2018, a second state agency medical consultant, Robert Kukla, M.D. ("Dr. Kukla"), reviewed the record and provided a physical RFC assessment. Tr. at 87–89. He indicated Plaintiff had the following RFC: occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and occasionally balance, stoop, kneel, crouch, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds. *Id.*

On February 6, 2018, a second state agency consultant, Samuel Goots, Ph.D. ("Dr. Goots"), concluded Plaintiff did not meet Listings 12.04, 12.06,

and 12.15, but had moderate limitation in each of the four areas of mental functioning. Tr. at 84–86. He provided the same mental RFC assessment as Dr. Wright. *Compare* Tr. at 71–73, *with* Tr. at 89–91.

Also on February 6, 2018, Plaintiff followed up with Dr. Wyland, who indicated his left knee pain was gradually worsening and his recovery from knee surgery was hampered by his back pain. Tr. at 802. Dr. Wyland stated Plaintiff continued to require a cane to walk. *Id.* He observed mild swelling and tenderness of the left knee on exam. Tr. at 806. He stated Plaintiff would eventually require left total knee replacement, but hoped he could wait 10 to 20 years. *Id.* He recommended continued home strengthening, working out with a trainer in a gym, occasional physical therapy, biannual viscosupplementation injections, and a brace. *Id.*

On February 7, 2018, Plaintiff reported no improvement in PTSD and MDD symptoms. Tr. at 860. Dr. Wininger observed Plaintiff to be walking very slowly with a cane, to appear to be in pain, to be distracted at times, to demonstrate an anxious mood and congruent affect, and to have fair insight and judgment. Tr. at 860–61.

On March 7, 2018, Plaintiff endorsed continued symptoms of PTSD and depression, as well as problems with medical issues and pain. Tr. at 858. He stated he felt aggravated and irritated all the time and was not doing well. *Id.* Dr. Wininger observed Plaintiff walking slowly with a cane and indicated

he "appeared to be in pain." *Id.* She noted Plaintiff was distracted at times, had a frustrated and angry mood and affect, and showed fair insight and judgment. Tr. at 859.

Plaintiff underwent a sleep study on March 22, 2018, that showed borderline obstructive sleep apnea with no significant hypoxia. Tr. at 845. Andrea K. Maas, M.D. ("Dr. Maas"), instructed Plaintiff to lose weight and to change his sleep positioning. Tr. at 845–46.

On March 21, 2018, Plaintiff complained of increased symptoms of PTSD and depression and indicated he felt aggravated and irritated all the time. Tr. at 854. He endorsed severe, daily pain. *Id.* Dr. Wininger observed Plaintiff to walk slowly with a cane, to appear to be in pain and distracted at times, and to have fair insight and judgment. Tr. at 854–55.

Plaintiff presented CORA Rehabilitation for a three-hour functional capacity evaluation ("FCE") on March 27, 2018. Tr. at 810–32. Physical Therapist Vincent DiGiovanna ("PT DiGiovanna"), noted the FCE results reflected Plaintiff's consistent and maximal effort and were considered a reliable indicator of his true functional abilities. Tr. at 810, 813. He found Plaintiff qualified to perform work at below the sedentary exertional level "due to the inability to stand and walk for more than a combined total of 2 hours per day, requiring use of an [assistive device/single-point cane] for walking, inability to balance on even surfaces, and the need to alternate

sitting and standing throughout the day as needed." *Id.* He noted that "with increased activity today, [Plaintiff's] functional ability seemed to decrease especially with regards to standing and walking" such that "[b]y the end of testing[,] increased instability, imbalance, and 'buckling' of the [left] knee were consistently observed." *Id.* PT DiGiovanna provided the following specific limitations:

> Walking and standing are limited to an occasional basis with [single-point cane/assistive device] for stability and safety[;] [l]ow crouching and kneeling are limited to never[;] [s]itting is limited to a frequent basis with rest breaks as needed for pain management and endurance[;] [c]lient is able to climb on an occasional basis with [upper extremity] support and increased safety noted with ascending with [right lower extremity] and descending with [left lower extremity] first[;] [s]tooping is limited to an occasional basis[; and] [f]loor and lower level lifting are limited to never.

Tr. at 810–11.

Plaintiff presented to Psychologist Lyndsey Zoller ("Ms. Zoller"), for psychotherapy on March 28, 2018. Tr. at 847. Ms. Zoller observed Plaintiff to have depressed mood and affect and fair insight. Tr. at 848. Plaintiff reported suicidal and homicidal ideation in the recent past, but denied current suicidal and homicidal ideation. *Id.* He indicated he had been drinking heavily and was withdrawn. *Id.* Ms. Zoller encouraged Plaintiff to be more mindful of the amount of alcohol he was consuming. *Id.*

Plaintiff followed up with Dr. Hammett on April 16, 2018. Tr. at 1379. He weighed 254.2 pounds and had a body mass index ("BMI") of 39.8%. Tr. at 1380.

On June 17, 2018, Plaintiff presented to the Dorn ER for pain and edema in his right hip. Tr. at 1365. He indicated had fallen from his porch and injured his hip two weeks prior. *Id.* Nurse Practitioner Travis Crawford ("NP Crawford"), observed a massive hematoma on Plaintiff's right lateral upper thigh and ecchymotic bruising to Plaintiff's right inner thigh/groin area. Tr. at 1367. Plaintiff endorsed pain to touch and with hip flexion and extension. *Id.* X-rays revealed no fracture. Tr. at 1367–68. NP Crawford assessed right hip pain and hematoma. Tr. at 1368. He prescribed antibiotics and instructed Plaintiff to continue taking Meloxicam for pain and to follow up with his primary care physician and for an orthopedic consultation. *Id.*

Plaintiff presented to the Dorn ER for increased swelling of the right hip hematoma on July 1, 2018. Tr. at 1358. Carl Peter, M.D. assessed right thigh cellulitis and hematoma. Tr. at 1362. Plaintiff was hospitalized from July 2 to July 6, 2018, for an infected right hip hematoma, cellulitis of the right hip, Morel-Lavallee defect of the right hip, alcohol abuse, and malnutrition. Tr. at 1102. He "acknowledged drinking 7 or 8 mixed drinks of alcohol per day," and explained he "fills a cup with about 4 oz of liquor and mixes it for a mixed drink." Tr. at 1149. On July 2, 2018, Dr. Chu surgically

incised and drained the hematoma and placed a wound vac in the area. Tr. at 1103. Plaintiff was discharged with home health and received a rolling walker and a device for reaching. Tr. at 1129, 1130, 1201–03. He declined to participate in a substance abuse treatment program. Tr. at 1149.

On July 18, 2018, the VA issued a cane to reduce pressure on Plaintiff's left knee when ambulating. Tr. at 1111.

On August 2, 2018, Plaintiff complained of pain in his right thigh and left knee, as well as itching since starting antibiotics. Tr. at 1174. He indicated he had difficulty walking. Tr. at 1175. Dr. Hammett observed bilateral knee warmth and tenderness over the medial and lateral patellae and positive bilateral bulge sign. Tr. at 1176. She stated Plaintiff's right thigh dressings were intact, clean, and dry. *Id.* Dr. Hammett instructed Plaintiff to continue Keflex and dressing changes for the right thigh cellulitis and to take Benadryl for the itching. Tr. at 1178. She informed Plaintiff he would have to wait for the cellulitis to heal before addressing his left knee pain. *Id.*

Plaintiff completed the trauma recovery program on August 4, 2018. Tr at 1171. Ms. Zoller noted Plaintiff was able to reduce his alcohol use slightly and made minimal progress toward his goals. *Id.* Plaintiff reported sadness, suicidal ideation, lack of appetite, sleep disturbance, fatigue, lack of motivation, and feeling "slowed down" had prevented him from completing

his treatment goals. *Id.* Ms. Zoller referred Plaintiff back to Dr. Wininger for individual psychotherapy. *Id.*

On September 10, 2018, Plaintiff described right hip pain as an eight. Tr. at 1165. Joseph P. Jackson, Jr., M.D. ("Dr. Jackson"), observed Plaintiff's right hip to be healing well. *Id.* He stated Plaintiff would likely require left knee replacement sooner rather than later, but would have to lose a significant amount of weight prior to undergoing surgery. *Id.*

Babatunde Edun, M.D., discharged Plaintiff from the infectious disease clinic on November 7, 2018, as the cellulitis of his right hip had resolved. Tr. at 1410–11.

### 3. Other Agency Determinations

On March 29, 2018, the Department of Veterans Affairs ("DVA") issued a decision on Plaintiff's claim for an increase in his service-connected compensation. Tr. at 189–99. The DVA determined Plaintiff's impairment rating for PTSD had increased from 50% to 70%, and continued his 10% impairment ratings for degenerative arthritis of the left knee and instability of the left knee. Tr. at 195–99.

On April 16, 2018, Plaintiff entered into an agreement settling his worker's compensation case for $160,000. Tr. at 217–21.

On May 18, 2018, the South Carolina Retirement Systems approved Plaintiff's claim for disability retirement as a member of the Police Officers Retirement System. Tr. at 282.

On July 16, 2018, the DVA issued another decision granting Plaintiff entitlement to individual unemployability "because [he was] unable to secure or follow a substantially gainful occupation as a result of service-connected disabilities." Tr. at 200–02, 206–13.

### C. The Administrative Proceedings

#### 1. The Administrative Hearing

##### a. Plaintiff's Testimony

At the hearing on December 13, 2018, Plaintiff testified he lived with his wife and six-month old son. Tr. at 36–37. He described himself as 5'7" tall and weighing 255 pounds. Tr. at 37. He said he graduated from high school and completed one semester of college. Tr. at 37. He stated he last worked as an investigator for the Marion Police Department, carrying 20 to 25 pounds regularly. Tr. at 37–38. He also previously worked as a sergeant for Marion County, where he supervised other officers, but did not handle scheduling or have the power to hire and fire his subordinates. Tr. at 38–39. He testified he was in the Army Reserve from 1997 to 2007 and was deployed in 2003 and 2004. Tr. at 39. He stated he had a Military Occupational Specialty ("MOS") of 54 Bravo Chemical Specialist and was responsible for setting up washdown

tents for decontamination following potential exposure to weapons of mass destruction. Tr. at 39–40. He said he regularly carried 60 to 65 pounds. Tr. at 40.

Plaintiff reported his back bothered him, hurting if he sat too long. *Id.* He stated his left leg was shorter than his right and he used a cane to reduce pain and compensate for balance problems. *Id.* He indicated he fell off his porch, which led to a weeklong hospitalization in July 2018. *Id.* He reported he had back surgery in November 2017 that provided some relief for a pinched nerve that caused pain into his legs. Tr. at 41–42. He said he still experienced shooting pain down his leg, but it did not occur constantly. Tr. at 42. He reported having surgery earlier in the year to drain a hematoma after he fell off the porch. Tr. at 51.

Plaintiff said he had nightmares, spent a lot of time in his house, and did not socialize like he had in the past. *Id.* He said that for years, he had looked over his shoulder and been easily distracted in public settings. *Id.* He noted he could no longer work out, which had provided stress relief in the past, and had gained weight. *Id.* He said he started mental health treatment for PTSD in 2013. Tr. at 42–43.

Plaintiff testified he was medically retired from the police department because his FCE reflected limited physical abilities that would not permit him to perform his job. *Id.*, and 48–49. He described his PTSD as worsening

with increased sleep disturbance, nightmares, difficulty with social interaction, and problems with his thought processes. Tr. at 43. He said he had difficulty trusting people. Tr. at 43–44.

He testified his new baby, who was his third child, provided him more of a reason to live. Tr. at 44. He said his mother watched his son while his wife attended classes. Tr. at 44–45. He stated he required his mother's help because problems with his leg affected his balance. *Id.* He said he was uncomfortable keeping his son by himself because he feared he would fall and injure him. Tr. at 52–53. He indicated he did not do many chores around the house because his wife did most of them. Tr. at 45. He said he watched television much of the time. *Id.* He testified he was able to prepare a drink and a sandwich, but that his wife took care of everything else. *Id.* He estimated being able to sit for 15 to 20 minutes before his back started hurting. *Id.* He said he could walk better than he could stand in one spot. Tr. at 45–46. He said he could not work because symptoms of PTSD caused him difficulty being around others. Tr. at 46. He noted some of his medications caused dizziness and PTSD caused forgetfulness. Tr. at 46–47. He said Buspar and Trazadone made him drowsy. Tr. at 53. He admitted he had a license and drove short distances, but denied being able to drive long distances because back pain prevented him from sitting for too long. Tr. at 47. He noted his wife drove the 45 minutes to the hearing. *Id.* He thought he

could probably carry a gallon of milk from the car to his house, if necessary. Tr. at 51–52. He said he could no longer lift his 20-pound son, but could hold him in his lap. Tr. at 52.

In response to questions by his counsel, Plaintiff indicated he had gained 50 pounds since becoming less active and because of the medications and depression and anxiety. Tr. at 48. He testified he was hurt on the job when he fell down a flight of stairs during an investigation into an abandoned building. Tr. at 48–49. He reported having settled a worker's compensation claim from the injury and receiving VA benefits. Tr. at 49. He said his back and knee pain were always present, with severe knee pain daily and severe back pain half of the time. Tr. at 49–50. He estimated being able to walk five minutes before needing to stop or sit down. Tr. at 50. He said he remained in the car while his wife went grocery shopping. *Id.*

Plaintiff said his hobbies previously included lifting weights and working on old cars. Tr. at 53. He reported having an old car that had been sitting in his garage for a year. *Id.* He said he sometimes watched 30-minute to hour-long television shows more than once because he became sidetracked or dozed off and was unable to follow them. Tr. at 54. He estimated sleeping three or four hours at night and said he would lie down during the day, but would not fall asleep despite being tired. Tr. at 54–55. He said his father did

his yardwork. Tr. at 55. He said he used his TENS unit almost every day for 10 to 15 minutes on his back and knee. Tr. at 55–56.

b.    Vocational Expert Testimony

Vocational Expert ("VE") William Villa reviewed the record and testified at the hearing. Tr. at 57–61. The VE categorized Plaintiff's PRW as (1) a police officer as medium, skilled, specific vocational preparation ("SVP") of 6, *Dictionary of Occupational Titles* ("*DOT*") number 375.263-014; (2) a sheriff's deputy as medium, skilled, SVP of 5, *DOT* number 377.263-010; and (3) a U.S. Army chemical operations specialist as medium, skilled, SVP of 6, *DOT* number 199.384-010. Tr. at 58–59. The ALJ described a hypothetical individual of Plaintiff's vocational profile with the following limitations: lift and carry ten pounds occasionally and less than ten pounds frequently; sit for six hours in an eight-hour shift; stand and walk for two hours in an eight-hour shift; occasionally climb ramps or stairs; occasionally climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; must use a handheld assistive device for all ambulation, but able to use the other arm to lift and carry up to the exertional limits; limited to simple, routine, and repetitive tasks, but could not work at production rate pace; able to use level-two reasoning development; limited to receiving simple work-related instructions and making simple work-related decisions; occasionally interact with supervisors and coworkers, but no team-type activity; and no interaction

with the general public. Tr. at 59. The VE testified the hypothetical individual could not perform Plaintiff's PRW or any other jobs in the regional or national economy. Tr. at 59–60.

The ALJ provided a second hypothetical that modified the first hypothetical to allow work at a production rate pace. Tr. at 60. The VE testified the hypothetical individual could perform the following occupations: (1) printed circuit board assembler, sedentary, unskilled, *DOT* number 726.684-110; (2) optical accessories polisher, sedentary, unskilled, *DOT* number 713.684-038; and (3) semiconductor bonder, sedentary, unskilled, *DOT* number 726.685-066, with 36,000, 22,000, and 23,000 positions available in the national economy, respectively. *Id.*

In response to questioning by Plaintiff's counsel, the VE testified no positions would be available if the individual needed to alternate between sitting and standing and could sit no more than 15 to 20 minutes, with a five minute walk in between because the individual would not be able to maintain minimum production standards. Tr. at 61. The VE also testified no work would be available if the individual were off task 15% of the workday. *Id.*

### 2. The ALJ's Findings

In his decision dated March 1, 2019, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2. The claimant has not engaged in substantial gainful activity since August 31, 2016, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairments: spine disorder, dysfunction of the major joints, obesity, depression, and post-traumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except he must use a handheld assistive device for all ambulation and the other hand cannot be used to lift and carry up to the exertional limits. He can push/pull as much as can lift/carry. The claimant can climb ramps and stairs occasionally. He can occasionally balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds. He is able to perform simple, routine, and repetitive tasks and is able to use Level 2 Reasoning Development. He is limited to receiving simple, work instructions and making simple, work-related decisions. He can occasionally interact with supervisors and co-workers. He can have no interaction with the general-public, and cannot participate in team-type activity with co-workers.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on August 21, 1978 and was 38 years old, which is defined as a younger individual age 18–44, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, and 404.1569a).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from August 31, 2016, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 17–25.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ did not properly evaluate his impairments under Listings 12.04 and 12.14; and

2)    the ALJ's RFC assessment does not account for all of his impairments and limitations.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether he has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents him from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, he will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that his impairments match several specific criteria or are "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if he can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that he is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th

Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id.*, *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound

foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.     Analysis

1.     Listings Evaluation

Plaintiff argues the ALJ erred in concluding his impairments did not meet Listings 12.04 and 12.15. [ECF No. 16 at 29]. He maintains the evidence supported a finding that he met part A of Listing 12.04, as he had a depressive disorder characterized by depressed mood, diminished interest in almost all activities, appetite disturbance, sleep disturbance, decreased energy, feelings, of guilt or worthlessness, difficulty concentrating or thinking, and thoughts of death or suicide. *Id.* He contends he also met part B of the listing because he had marked impairment in interacting with others and in concentration, persistence, or pace. *Id.* He claims the evidence also shows he met Listing 12.15 based on documentation from his physicians "that he had been exposed to actual or threatened death, serious injury, or violence . . . had subsequent involuntary re-experiencing of the traumatic event . . .

had disturbance of mood and behavior; . . . had increases in arousal and reactivity," and also met the part B criteria. *Id.* at 29–30.

The Commissioner argues the ALJ failed to prove his impairments met Listings 12.04 and 12.15, because the evidence did not suggest he had marked limitation in two broad areas of mental functioning or extreme limitation in one broad area of mental functioning. [ECF No. 18 at 13–15].

To meet Listing 12.04, a claimant must have a depressive, bipolar, or related disorder, satisfied by meeting the requirements of parts A and B or A and C. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04. Part A requires medical documentation of the requirements in paragraph 1 or 2.[4] 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(A). Paragraph 1 requires a depressive disorder characterized by five or more of the following: (a) depressed mood; (b) diminished interest in almost all activities; (c) appetite disturbance with change in weight; (d) sleep disturbance; (e) observable psychomotor agitation or retardation; (f) decreased energy; (g) feelings of guilt or worthlessness; (h) difficulty concentrating or thinking; and (i) thoughts of death or suicide. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(A)(1).

---

[4] The undersigned declines to address the paragraph 2 criteria in part A and the criteria in part C, as Plaintiff does not argue the medical evidence supports these criteria.

To meet Listing 12.15, the claimant must have a trauma- or stressor-related disorder and satisfy the criteria in parts A and B or A and C.[5] 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.15. Part A requires medical documentation of all of the following: (1) exposure to actual or threatened death, serious injury, or violence; (2) subsequent involuntary re-experiencing of the traumatic event (for example, intrusive memories, dreams, or flashbacks); (3) avoidance of external reminders of the event; (4) disturbance in mood and behavior; and (5) increases in arousal and reactivity (for example, exaggerated startle response, sleep disturbance). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.15(A).

Listings 12.04 and 12.15 contain the same part B criteria. To meet part B of the listings, the claimant must have extreme limitation of one or marked limitation of two of the following areas of mental functioning: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.04(B).

Listing 12.00(E) explains what is encompassed in each of the part B criteria. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E). ALJs are not required to document findings with respect to all examples that illustrate the nature of each area of mental functioning. *Id.* Because Plaintiff argues he has

---

[5] The undersigned has not addressed the part C criteria because Plaintiff does not argue he meets it.

marked impairment in interacting with others and in concentration, persistence, or pace, ECF No. 16 at 29, the undersigned examines only these areas of mental functioning.

Interacting with others "refers to the abilities to relate to and work with supervisors, co-workers, and the public." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(2). Examples of the nature of this area of mental functioning include:

> cooperating with others; asking for help when needed; handling conflicts with others; stating own point of view; initiating or sustaining conversation; understanding and responding to social cues (physical, verbal, emotional); responding to requests, suggestions, criticism, correction, and challenges; and keeping social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

*Id.*

Concentrating, persisting, or maintaining pace "refers to the abilities to focus attention on work activities and stay on task at a sustained rate." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(E)(3). Examples of the nature of this area of mental functioning include:

> initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number and length of rest periods during the day.

*Id.*

Relevant to evaluation under the listings, marked limitation means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(F)(2)(d). Extreme limitation means the individual is "not able to function in [the] area independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(F)(2)(e).

Assuming arguendo Plaintiff's impairments meet the criteria in part A of Listings 12.04 and 12.15, substantial evidence supports the ALJ's finding that his impairments did not meet the part B criteria and, thus, did not meet the Listings. The ALJ did not address the part A criteria of Listings 12.04 and 12.15, but concluded Plaintiff's impairments met neither listing because they did not satisfy the part B criteria. Tr. at 18.

Although Plaintiff cites evidence of his difficulty interacting with coworkers and his social isolation to support his argument that he had marked impairment in interacting with others, ECF No. 16 at 30, the ALJ appears to have considered his abilities and limitations in this area of mental functioning. He concluded Plaintiff had a moderate, as opposed to a marked, degree of impairment in this area, explaining:

> The claimant reports being hyper-vigilant in public (6F/10; 9F/20, 94; 22F/28, 34, 204). He also frequently presents as depressed, irritable, or anxious (6F/10, 29; 22F/41, 121, 210; 24F/308). However, the claimant testified that he has a friend and cousin

that he interacts with regularly. He also said his mother helps
him watch his son almost daily. He reported that he can go to
church but prefers to sit in the back (22F/209).

Tr. at 18–19. Moderate limitation means the individual has fair ability to
functioning independently, appropriately, effectively, and on a sustained
basis, 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00(F)(2)(c), and the ALJ cited
sufficient evidence to support his conclusion that Plaintiff had fair, as
opposed to seriously limited, ability to interact with others.

While Plaintiff also argues he had marked limitation in concentration,
persistence, or pace, as evidenced by his testimony and his medical providers'
documentation of problems with concentration, the ALJ again considered his
abilities and limitations in this area of mental functioning in concluding he
had a moderate, as opposed to a marked, degree of impairment. He explained:

The claimant reports and presents with poor concentration
(6F/32, 44, 73; 9F/41, 56, 84; 22F/211). However, he sometimes
presents with intact concentration (6F/11, 29; 9F/43, 57, 115;
22F/204). The claimant did testify that he has to watch television
shows several times because he cannot follow them and gets
distracted. He also testified that he is able to drive short
distances.

Tr. at 19. Thus, the ALJ cited evidence of significant impairment, as well as
evidence of normal functioning to support his conclusion that Plaintiff had
fair, as opposed to seriously limited, ability to maintain concentration,
persistence, or pace.

Given the foregoing, the court finds substantial evidence supports the ALJ's conclusion that Plaintiff did not meet Listings 12.04 and 12.15.

2.      RFC Assessment

Plaintiff argues the ALJ assessed an RFC that is not supported by substantial evidence. [ECF No. 16 at 28, 30–34]. The Commissioner argues the ALJ's RFC assessment is supported by substantial evidence. [ECF No. 18 at 16].

A claimant's RFC represents the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a). The RFC assessment must include a narrative discussion describing how all the relevant evidence in the case record supports each conclusion and must cite "specific medical facts (e.g., laboratory findings) and non-medical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996). The ALJ must determine the claimant's ability to perform work-related physical and mental abilities on a regular and continuing basis. *Id.*, at *2. He must explain how any material inconsistencies or ambiguities in the record were resolved. *Id.*, at *7. "[R]emand may be appropriate . . . where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (citing *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)).

Because Plaintiff raises multiple specific allegations of error as to the RFC assessment, the undersigned has addressed each accordingly.

### a. Combined Effect of Impairments

Plaintiff claims the ALJ did not consider the combined effect of his impairments in evaluating his RFC. [ECF No. 16 at 28]. He maintains he cannot meet the requirements of sedentary work because his limitations significantly erode the sedentary occupational base. *Id.* at 30–31.

The Commissioner argues the record supports Plaintiff's ability to perform sedentary work with postural limitations and with the aid of a handheld ambulatory assistive device. [ECF No. 18 at 16–17].

Pursuant to 20 C.F.R. § 404.1523(c), the ALJ is to "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately would be of sufficient severity." When a claimant has multiple impairments, the statutory and regulatory scheme for making disability determinations, as interpreted by the Fourth Circuit, requires that the ALJ consider the combined effect of all those impairments in determining the claimant's RFC and his disability status. *See Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989); *see also Saxon v. Astrue*, 662 F. Supp. 2d 471, 479 (D.S.C. 2009) (collecting cases in which courts in this District have reiterated the importance of the ALJ's explaining how he evaluated the combined effects of a claimant's impairments). The ALJ

must "consider the combined effect of a claimant's impairments and not fragmentize them." *Id.*

It must be "clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments." *Brown v. Astrue*, C/A No. 0:10-CV-1584-RBH, 2012 WL 3716792, at *6 (D.S.C. Aug. 28, 2012), *citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). However, absent evidence to the contrary, the court should accept the ALJ's assertion that he considered the combined effect of the claimant's impairments. *See Reid v. Commissioner of Social Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter.").

The ALJ did not specify he had considered the combined effect of Plaintiff's impairments. *See generally* Tr. at 15–25. He briefly discussed the evidence that pertained to Plaintiff's back and knee impairments, concluded the evidence did not support the severity he alleged, and found they limited him to "sedentary work with the corresponding postural limitations." Tr. at 21. He then considered evidence as to Plaintiff's mental impairments, concluding the evidence failed to support the severity he alleged and that his limitations were accommodated by the restrictions in the RFC assessment.

Tr. at 21–22. The ALJ "considered the impact of the claimant's obesity in exacerbating his problems and functional limitations caused by other impairments" in finding he was "limited to less than the full range of sedentary work." Tr. at 22.

The ALJ's evaluation of Plaintiff's impairments appears to be fragmented, as evidenced by his separate consideration of physical and mental impairments. Although such consideration might not be harmful in all cases, it was harmful here, where the record contained evidence that Plaintiff's physical impairments exacerbated his mental impairments and vice versa. *See* Tr. at 360 (reflecting Dr. Ellison's opinion that PTSD was "a confounding factor" in Plaintiff's convalescence); Tr. at 398, 616–17, 660, 689 (showing Plaintiff's sleep was disturbed by nightmares and pain); Tr. at 795 (containing Dr. Ellison's indication that he did not recommend lumbar fusion based, in part, on Plaintiff's "overlay of PTSD"); and Tr. at 745–46, 854–55, 859, 860–61 (indicating Dr. Wininger observed Plaintiff to appear to be in significant pain and to be distracted). In light of the foregoing, the ALJ's decision does not reflect his consideration of the combined effect of Plaintiff's impairments in light of 20 C.F.R. § 404.1523(c) and Fourth Circuit precedent.

The court now turns to Plaintiff's argument that his use of a cane for balance, in addition to other limitations, significantly eroded the sedentary occupational base such that he was unable to perform any jobs. [ECF No. 16

at 31]. In considering Plaintiff's argument, the undersigned compared the RFC assessment to the vocational testimony and discovered a discrepancy between the two. The ALJ asked the VE to consider an individual with the following RFC:

> The ability to lift and carry ten pounds occasionally, less than 10 pounds frequently. He can sit for six hours in an eight-hour shift. Can stand and walk for two hours in an eight-hour shift. Can occasionally climb ramps or stairs. Occasionally climb ladders, ropes o[r] scaffolds. Occasionally balance, stoop, kneel, crouch, crawl. Must use a handheld assistive device for all ambulation, but *he is able to use the other arm to lift and carry up to the exertional limits*. Is limited to simple, routine, and repetitive tasks, but he could not work at production rate pace. He is able to use level two reasoning development. And he's limited to receiving simple work-related instructions and making simple work-related decisions. He can occasionally interact[] with supervisors and co-workers, but no team-type activity. And no interaction with the general public.

Tr. at 59 (emphasis added). The VE testified the individual would be unable to perform Plaintiff's PRW or any other jobs in the national economy based on "the inability to work at a production rate or pace." Tr. at 59–60. For a second hypothetical questions, the ALJ removed the restriction as to production-rate pace, and the VE identified jobs as a printed circuit board assembler, an optical accessories polisher, and a semiconductor bonder. Tr. at 60. The ALJ cited these jobs to meet his burden at step five. *See* Tr. at 24.

The ALJ's RFC assessment differs from the hypothetical he described to the VE in one significant respect. In his decision, the ALJ found Plaintiff "must use a handheld assistive device for all ambulation and the other hand

*cannot* be used to lift and carry up to the exertional limits." Tr. at 19 (emphasis added). Thus, the ALJ questioned the VE and the VE identified jobs in response to a hypothetical question that included use of the arm and hand not gripping the assistive device to carry up to 10 pounds, but the RFC assessment includes greater restriction as to Plaintiff's ability to carry items, providing Plaintiff cannot carry items with the hand he uses for his assistive device and can carry unspecified weight below the exertional limit with the other hand.[6]

For the VE's opinion to be relevant, "it must be based upon a consideration of all other evidence in the record . . . and it must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Johnson*, 434 F.3d at 659 (quoting *Walker*, 889 F.2d at 50); *see also English v. Shalala*, 10 F.3d 1080, 1085 (4th Cir. 1993). A VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. *See id.* Because the RFC assessment in the ALJ's decision is more preclusive as to Plaintiff's ability to carry than the RFC he posed to the VE, substantial

---

[6] To the extent the Commissioner may argue this was a harmless scrivener's error, the undersigned has considered and rejected this argument. In the absence of an explanation for the specific restrictions included in the RFC assessment, the court is unable determine with certainty whether the ALJ meant to restrict Plaintiff's ability to carry with the hand unencumbered by use of the assistive device.

evidence does not support his reliance on jobs cited by the VE in response to the hypothetical question to meet his burden at step five.

b.     Consideration of FCE

Plaintiff claims the ALJ erroneously relied on the FCE as supporting the assessed RFC. [ECF No. 16 at 31–32]. The Commissioner argues that because Plaintiff filed for benefits after March 27, 2017, the revised regulations apply to his claim and that the ALJ adequately considered the FCE results based on the requirements in the new regulations. [ECF No. 18 at 17–25].

For claims filed on or after March 27, 2017, the rules in 20 C.F.R. § 404.1520c direct ALJs in evaluating medical opinions and prior administrative medical findings. Pursuant to 20 C.F.R. § 404.1520c(b), ALJs are to articulate in their decisions "how persuasive [they] find all of the medical opinions." The are to explain how they considered the supportability and consistency factors in evaluating a medical source's opinion. 20 C.F.R. § 404.1520c(b)(2). "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion . . . the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(1). "The more consistent a medical opinion . . . is with the evidence from other medical sources and nonmedical sources in the

claim, the more persuasive the medical opinion . . . will be." 20 C.F.R. § 404.1520c(c)(2).

If the ALJ finds "medical findings about the same issue" to be "equally persuasive," he must articulate how he "considered the other most persuasive factors" in his decision. 20 C.F.R. § 404.1520c(b)(3). Those other factors include relationship between the medical provider and the claimant, the specialization of the medical provider offering the opinion, and other factors that tend to support or contradict the medical opinion. 20 C.F.R. § 404.1520c(c)(3), (4), (5).

The ALJ found opinions from Dr. Wright, Dr. Goots, and Dr. Humphries to be "persuasive." Tr. at 22. He also found the opinion of PT DiGiovanna from CORA Rehabilitation to be "persuasive." Tr. at 23.

Because the ALJ found equally persuasive Dr. Humphries's and PT DiGiovanna's opinions as to Plaintiff's physical limitations, he was required to explain his consideration of the factors in 20 C.F.R. § 404.1520c(c)(3), (4), and (5) as to each.

The ALJ noted Dr. Humphries was a "state level physical consultant," and discussed her opinion follows:

> Dr. Humphries opined the claimant should be limited to light work except he could only stand or walk two hours out of an eight-hour day. He could frequently balance. He could occasionally stoop, kneel, crouch, crawl, or climb ladders, ropes, scaffolds, ramps, and stairs. This opinion is consistent with the evidence in the record, specifically for someone with claimant's

surgical history of back surgery and two knee surgeries (5F/1; 7F/4; 12F/4). It is also consistent with the physical exams showing his impaired balance but good strength (3F/2, 13, 4F/22; 7F/24, 78; 16F/2; 20F/6; 24F/66, 78).

Tr. at 22.

The ALJ explained his consideration of the opinions of PT DiGiovanna and his assistant as follows:

> They opined that the claimant was able to perform at the below sedentary level with the following modifications/accommodations. Walking and standing should be limited to an occasional basis with an assistive device for stability and safety. Low crouching and kneeling should be limited to never. Sitting would be limited to a frequent basis with rest breaks as needed for pain management and endurance. The claimant would be able to climb on an occasional basis with upper extremity support and increased safety noted with ascending with right lower extremity and descending with left lower extremity first. Stooping should be limited to an occasional basis. He should never floor and lower level lift. The evaluators examined the claimant and they have program knowledge and experience providing disability evaluations. Their opinions are also consistent with other evidence in the record, including the claimant's surgical history of back surgery and two knee surgeries or the physical exams showing his impaired balance but good strength (3F/2, 13, 4F/22; 5F/1; 7F/424, 78; 12F/4; 16F/2; 20F/6; 24F/66, 78).

Tr. at 23.

The ALJ's decision shows he considered Dr. Humphries's status as a "state level physical consultant" as a factor that tended to support her opinion pursuant to 20 C.F.R. § 404.1520c(c)(5). It also shows he considered PT DiGiovanna's examining relationship with Plaintiff and his "program knowledge and experience providing disability evaluations" in accordance

with 20 C.F.R. § 404.1520c(c)(3) and (5). Thus, although the ALJ presumably considered Dr. Humphries's and PT DiGiovanna's records to be equally persuasive, he cited more evidence in support of PT DiGiovanna's opinion than Dr. Humphries's opinion.

Despite the ALJ's citation of more evidence to support Dr. DiGiovanna's opinion than Dr. Humphries's opinion, he adopted an RFC assessment more consistent with Dr. Humphries's opinion. Most notably, the ALJ declined to include a provision in the RFC assessment permitting Plaintiff to take rest breaks from sitting as needed, as indicated in PT DiGiovanna's opinion. *Compare* Tr. at 19, *with* Tr. at 23. He also included in the RFC assessment a provision for occasional kneeling and crouching, despite his acknowledgement that PT DiGiovanna found Plaintiff could never perform either of these postural maneuvers. *Compare* Tr. at 19, *with* Tr. at 23.

The court can reasonably reconcile the ALJ's failure to include every restriction PT DiGiovanna found in the RFC assessment by concluding he found PT DiGiovanna's opinion persuasive, as opposed to controlling. However, the court cannot reconcile the ALJ's failure to explain his reasons for rejecting additional restrictions he appears to concede as supported by the record. The ALJ's decision is devoid of any explanation as to how the restrictions he included specifically accommodated Plaintiff's impairments

and restrictions. *See generally* Tr. at 19–23. Therefore, the ALJ has failed to provide an accurate and logical bridge from the evidence to his conclusion as to Plaintiff's RFC. *See Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).

### c.    Consideration of Subjective Allegations

Plaintiff argues the ALJ failed to consider side effects of his medications. [ECF No. 16 at 32]. He contends the ALJ did not consider evidence that suggested he would require an excessive number of breaks and would be absent from work frequently. *Id.* at 33.

The Commissioner claims Plaintiff's arguments that the ALJ erred in failing to incorporate restrictions pertaining to changing positions and frequent breaks and absences are without merit because these restrictions are not supported by the record. [ECF No. 18 26–27]. He maintains the ALJ acknowledged Plaintiff's allegations as to the side effects of his medications, but found they were not work-preclusive and were accommodated by the restriction to simple, routine, repetitive tasks with level two reasoning and simple work instructions and work-related decisions. *Id.* at 31–32.

"Under the regulations implementing the Social Security Act, an ALJ follows a two-step analysis when considering a claimant's subjective statements about impairments and symptoms." *Lewis v. Berryhill*, 858 F.3d 858, 865–66 (4th Cir. 2017) (citing 20 C.F.R. § 404.1529(b), (c)). "First, the

ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Id.* at 866 (citing 20 C.F.R. § 404.1529(b)). "Second, the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform basic work activities." *Id.* (citing 20 C.F.R. § 404.1529(c)). The second determination requires the ALJ to consider "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [the plaintiff's] statements and the rest of the evidence, including [his] history, the signs and laboratory findings, and statements by [his] treating or nontreating source[s] or other persons about how [his] symptoms affect [him]." 20 C.F.R. § 404.1529(c)(4).

In evaluating alleged symptoms, the ALJ is to "evaluate whether the [claimant's] statements are consistent with objective medical evidence and the other evidence." SSR 16-3p, 2016 WL 1119029, at *6. "Other evidence that [the ALJ should] consider includes statements from the individual, medical sources, and any other sources that might have information about the individual's symptoms, including agency personnel, as well as the factors set forth in [the] regulations." *Id.* at *5; *see also* 20 C.F.R. § 404.1529(c)(3) (listing factors to consider, such as ADLs; the location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; treatment an individual receives or has received for

relief of pain or other symptoms; any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms). Pursuant to SSR 16-3p, the ALJ is to "explain which of an individual's symptoms [he] found consistent or inconsistent with the evidence in his or her record and how [his evaluation of the individual's symptoms led to [his] conclusions." *Id.* at *8. He must evaluate the "individual's symptoms considering all the evidence in his or her record." *Id.*

The ALJ acknowledged Plaintiff's allegations that his pain medication made him "drowsy, dizzy and forgetful" and that he had "issues lifting, squatting walking, sitting, standing, bending, reaching, kneeling, climbing stairs, getting along with others, concentrating, following instructions, completing tasks, and with his memory." Tr. at 20–21. Although he found Plaintiff's medically-determinable impairments could reasonably be expected to cause symptoms he alleged, he concluded his statements concerning the intensity, persistence, and limiting effect of his symptoms were not entirely consistent with the evidence of record. Tr. at 21. He found "the objective medical evidence . . . fail[ed] to support the alleged severity of [Plaintiff's] back and knee related impairments." *Id.* The ALJ discussed evidence in addition to the objective medical evidence of record, including treatment through surgery, injections, physical therapy, aquatic therapy, and pain

medication; use of a cane; and medical providers' observations that Plaintiff presented with pain, impaired balance, and reduce range of motion. *Id.* However, he concluded this evidence was outweighed by indications "he generally has normal tone, strength, and sensation." *Id.*

In *Lewis v*, 858 F.3d at 866, the court held "the ALJ's determination that objective evidence was required to support [the plaintiff's] evidence of pain intensity improperly increased her burden of proof." The court noted a claimant's "subjective evidence of pain intensity cannot be discounted solely based on objective medical findings." *Id.* Here, the ALJ similarly increased Plaintiff's burden by relying on the objective evidence to the exclusion of the subjective evidence of pain intensity. Although he acknowledged significant evidence that supported Plaintiff's allegations as to the limiting effect of pain and mental symptoms, he discounted that evidence with only a reference to some normal physical findings. Contrary to the direction in SSR 16-3p, the ALJ failed to explain which of Plaintiff's symptoms he found consistent or inconsistent with the evidence in the record and how his evaluation of Plaintiff's symptoms led to the RFC assessment.

d.     Moderate Difficulties in Concentration, Persistence, or Pace

Plaintiff claims the ALJ's RFC assessment fails to account for his difficulties in maintaining concentration, persistence, or pace. [ECF No. 16 at 34]. The Commissioner contends the ALJ explained how he accounted for

Plaintiff's moderate limitations in concentration, persistence, or pace in the RFC assessment. [ECF No. 18 at 29–31].

In *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015), the court found the ALJ erred in assessing the plaintiff's RFC. *Id.* It stated "we agree with other circuits that an ALJ does not account 'for a claimant's limitations in concentration, persistence, and pace by restricting the hypothetical question to simple, routine tasks or unskilled work.'" *Id.* The court explained that it was possible for the ALJ to find that the moderate concentration, persistence, or pace limitation did not affect the plaintiff's ability to work, but that remand was required "because the ALJ here gave no explanation." *Id.* This court has interpreted the Fourth Circuit's holding in *Mascio* to emphasize that an ALJ must explain how he considered the claimant's limitation in concentration, persistence, or pace in assessing his RFC. *See Sipple v. Colvin*, No. 8:15-1961-MBS-JDA, 2016 WL 4414841, at *9 (D.S.C. Jul. 29, 2016), adopted by 2016 WL 4379555 (D.S.C. Aug. 17, 2016) ("After *Mascio*, further explanation and/or consideration is necessary regarding how Plaintiff's moderate limitation in concentration, persistence, or pace does or does not translate into a limitation in his RFC.").

At step three of the evaluation process, the ALJ assessed moderate limitation with regard to concentration, persistence, or pace. Tr. at 19. He acknowledged evidence of poor and intact concentration and activities that

showed both impaired and seemingly-normal concentration to support his finding that Plaintiff was moderately limited in this area. *See id.* He then included the following mental restrictions in the RFC assessment:

> He is able to perform simple, routine and repetitive tasks and is able to use Level 2 Reasoning Development. He is limited to receiving simple, work instructions and making simple, work-related decisions. He can occasionally interact with supervisors and co-workers. He can have no interaction with the general-public, and cannot participate in team-type activity with co-workers.

Tr. at 19.

In addressing Plaintiff's mental impairments, the ALJ cited evidence of intact and impaired mental abilities, concluding "[o]verall the claimant's PTSD and depression require imposing the above-mental limitations." Tr. at 20–21. However, he failed to explain his reasons for including the particular mental restrictions in the RFC assessment, leaving the court to guess as to how it accommodates Plaintiff's moderate limitation in concentration, persistence, or pace.

For all the foregoing reasons, the court finds the ALJ's RFC assessment is not supported by substantial evidence.

### 3. Action Upon Remand

Plaintiff requests the court reverse that ALJ's decision and order the Commissioner to award him benefits. [ECF No. 16 at 37]. The Commissioner

maintains reversal is only permitted in rare circumstances, which are not present in this case. [ECF No. 18 at 32].

"Whether to reverse and remand for an award of benefits or remand for a new hearing rests within the sound discretion of the district court." *Smith v. Astrue*, No. 10-66-HMH-JRM, 2011 WL 846833, at *3 (D.S.C. Mar. 7, 2011) (citing *Edwards v. Bowen*, 672 F. Supp. 230, 237 (E.D.N.C. 1987). "The Fourth Circuit has explained that outright reversal—without remand for further consideration—is appropriate under sentence four 'where the record does not contain substantial evidence to support a decision denying coverage under the correct legal standard and when reopening the record for more evidence would serve no purpose'" and "where a claimant has presented clear and convincing evidence that he is entitled to benefits." *Goodwine v. Colvin*, No. 3:12-2107-DCN, 2014 WL 692913, at *8 (D.S.C. Feb. 21, 2014), *citing Breeden v. Weinberger*, 493 F.3d 1002, 1012 (4th Cir. 1974); *Veeney ex rel. Strother v. Sullivan*, 973 f.3d 326, 333 (4th Cir. 1992). An award of benefits is appropriate when "a substantial amount of time has already been consumed." *Davis v. Astrue*, No. 07-1621-JFA, 2008 WL 1826493, at *5 (D.S.C. Apr. 23, 2008) (citing *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984); *Tennant v. Schweiker*, 682 F.2d 707, 710 (8th Cir. 1982)).

The court finds substantial evidence does not support the ALJ's decision based on his failure to explain his RFC assessment in accordance

with relevant case law, regulations, and SSRs. Thus, the case does not meet the requirements for a remand for an award of benefits.

III.  Conclusion

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned reverses and remands this matter for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

IT IS SO ORDERED.

Shiva V. Hodges

March 11, 2020
Columbia, South Carolina

Shiva V. Hodges
United States Magistrate Judge